## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

LIBERTY LEGAL FOUNDATION;
JOHN DUMMETT;
LEONARD VOLODARSKY;
CREG MARONEY,

       Plaintiffs

                                 CASE NO: 2:12-cv-02143-cgc

       v.

NATIONAL DEMOCRATIC PARTY
of the USA, Inc.;
DEMOCRATIC NATIONAL COMMITTEE;
DEBBIE WASSERMAN SCHULTZ, and
CHIP FORRESTER

       Defendants

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS
### (HEARING REQUESTED)

       Pursuant to Federal Rule of Civil Procedure and this Court's Rules, Plaintiffs' submit this response in opposition to Defendants' motion for sanctions [Doc.25]. The Plaintiffs request a hearing on this motion.

### I.      Defendants and their Counsel Knowingly Lied to This Court

       The Defendants' motion for sanctions against the Plaintiffs [Doc.25], signed by Defense counsel, includes at least three factual accusations that are proven false by exhibits of record in the instant litigation.

### A.  Certifications to the Tennessee Secretary of State from the DNC

       The TNDP Defendants and Counsel assert, as grounds for their motion for sanctions against the Plaintiffs, "that the TNDP is the party that certifies the Democratic Party's nominee

for President of the United States to the Tennessee Secretary of State's Division of Elections." Doc.25 at 4. The TNDP Defendants' motion goes on to state, "it is the TNDP's sole responsibility to determine how Democratic Party nominees are determined, and Forrester, *the DNC* nor the NDC USA have any role in that process." *Id*. at 16 (emphasis added). Concluding, "Plaintiffs have clearly named these additional parties for the sole purpose of harassing and annoying their political opponents." *Id*.

Yet the DNC certificate identifying candidate Obama as the 2008 Democratic Presidential candidate to the Tennessee Secretary of State has been on record as an exhibit in the instant case since May 3rd, more than three weeks before the TNDP Defendants filed their motion for sanctions. *See* Doc.20-1. The DNC certificate was signed by then-DNC Chairman, Nancy Pelosi. *Id*.

The 2008 DNC certificate to the Tennessee Secretary of State proves that the DNC and its chairman historically "certifies the Democratic Party's nominee for President of the United States to the Tennessee Secretary of State's Division of Elections" and are, therefore, absolutely proper parties to the instant litigation. It also proves that the TNDP Defendants' allegation that Plaintiffs named the DNC and Schultz "for the sole purpose of harassing and annoying" them, was an intentional attempt by the TNDP Defendants' to deceive this Court.[1]

### B.  Plaintiff Dummett's Papers Filed with the TN Secretary of State

The TNDP Defendants' motion for sanctions against the Plaintiffs also asserts that Plaintiff Dummett "has not alleged that he has filed papers with the Tennessee Secretary of State

---

[1] Tennessee Election code does not support Defendants' assertion that the TNDP is "solely responsible" for this certification. The fact that the DNC and its chairman had actually certified the Democratic candidate in the past leaves no reasonable person with any doubt that the DNC is likely to do so again, regardless of what Tennessee code says on the matter, and the DNC and its Chairman are therefore proper parties to this litigation.

to appear on the ballot in Tennessee." While this cleverly crafted statement is technically true, it is also a willful deception on the part of defense counsel. On May 18th Plaintiffs filed as an exhibit in the instant case, Plaintiff Dummett's Tennessee Certificate of Write-In Candidacy, as filed with the Tennessee Secretary of State. Doc.24-2. This exhibit was filed with this Court and was part of the record in the instant case more than a week before defense counsel signed his motion for sanctions, claiming that Plaintiff Dummett "has not alleged that he has filed papers with the Tennessee Secretary of State to appear on the ballot in Tennessee."

To make such a statement to this Court, with full knowledge that Plaintiff Dummett has in fact filed such papers, is a deception. Couching the statement as "plaintiff has not yet alleged" does not make the deception acceptable conduct of an officer of this Court. When making an assertion of fact or law attorneys have a duty to disclose information to the Court when that information would directly conflict with the assertion of fact or law being made by the attorney. This is even more applicable when the attorney in question is accusing another attorney of perpetrating a fraud on the court.

### C.  Service and Show-Cause Orders in the Arizona Litigation

Defense Counsel knowingly misrepresented the nature and facts underlying service of process and show-cause orders issued in the Arizona litigation. *See* Doc.25 at 14. Defendants' motion for sanctions states:

> "Plaintiffs and Plaintiffs' counsel are operating in bad faith. It appears that this is not the first time that Plaintiffs have attempted this maneuver and that a show cause order has been issued against Plaintiffs for this exact same conduct in Arizona. In the Arizona action, Plaintiffs again served the NDC USA, moved for default judgment against it, all while failing to serve the Democratic National Committee ("DNC") and Debbie Wasserman-Schultz. This ultimately resulted in the Court issuing a show cause order ordering Plaintiffs to show service upon the DNC and Wasserman-Schultz."
> Doc.25 at 14. (internal citations deleted).

It is apparent from these allegations that Defense counsel has studied the Arizona litigation, and has likely had contact with the DNC's attorney in that litigation. Yet his description of the show cause orders and the timing of service of process in that case are deceptive at best.

It is clear from the record in the Arizona litigation that the DNC was served at its Washington DC office with a summons and first and second complaint in the Arizona litigation on December 22, more than a month before the motion for default judgment against the NDP USA was filed in that case. That process mis-named the DNC as the NDP USA because at that time Plaintiffs counsel believed that the DNC was an affiliate of the NDP USA. This was explained to Defense counsel several weeks before he filed Defendants' motion for sanctions. *See* Doc.26-1, Decl. Ben Gastel, at 10. Regardless of the procedural effectiveness of the December 22 attempt at service upon the DNC, the DNC in fact received the summons and complaint in both the Arizona and the instant lawsuits on December 22. Decl. Van Irion ¶9; *see also* Ex.1, DNC Return Receipt. Despite this fact Defense counsel, who represents the DNC in the instant litigation, chose to sign and file a motion with this Court accusing Plaintiffs of intentionally failing to serve the DNC as an intentional attempt to deceive this Court.

Current DNC Chairman Debbie Wasserman-Schultz was also served at her Washington DC office on January 30. This summons was directed to Defendant Schultz and this complaint properly named both her and the DNC. That attempt at service was also actually received by Schultz, as confirmed by the U.S. Post Office [Dec. Irion ¶10; *see also* Ex.2], but was not legally sufficient *only* because the certified mail return receipt was never delivered to the Plaintiffs. [2]

---

[2] It is very interesting that Defendant Schultz chose to not respond to the summons delivered to her on January 30. Service upon Defendant Schultz would have been sufficient for a default

Again, regardless of the legal sufficiency of service, the DNC and its Chairman had actual notice of the Arizona and the instant lawsuits at least twice before January 30. Again, Defense counsel's accusation that the Plaintiff's acted in bad faith and "failed to serve the Democratic National Committee (DNC) and Debbie Wasserman-Schultz," coupled with an accusation that Plaintiffs intended to deceive any court, cannot be supported by any reasonable attorney aware of the facts available to Defense counsel at the time he signed and filed Defendants' motion for sanctions.

With this background in mind, the first show-cause order issued by the Arizona Court [Doc.26-1] was simply that court's request that Plaintiffs explain what law supports service of process via certified mail. Plaintiffs responded, citing Federal Rules of Civil Procedure and Arizona state law. *See* Ex.3, AZ Resp. to Or. Show Cause. The Arizona Court concluded that the rules cited by the Plaintiffs applied to individuals, but not to corporations. The Arizona Court's conclusion did not cite any previous authority in support of its conclusion. *See* Ex.4. Regardless, neither this order nor the Plaintiffs' response, nor the court's conclusion, support or imply any of the misdeeds alleged by the TNDP Defendants, because this was a simple exchange regarding legal sufficiency of service.

Defense counsel's citation to documents from the Arizona litigation, and his accusations regarding the same, indicate that he was aware of the true nature of the order to show cause, yet he chose to sign a motion for sanctions making allegations that are clearly not true.

---

judgment against her had the return receipt been returned to the Plaintiffs and filed. Yet Defendant Schultz failed to respond to that summons and complaint. It would be easy to assume that Defendant Schultz somehow knew that the return receipt would never be filed. Given the history of Congressional abuse of the Post Office, an accusation that Defendant Schultz tampered with the U.S. mail is much less absurd than the accusations against attorney Irion. However, attorney Irion will not make such a serious accusation without direct evidence.

The second order to show cause from the Arizona lawsuit was premature as to the DNC because the DNC had not been added to the lawsuit until late January.[3] This was pointed out to the Arizona Court in the Plaintiffs' response, and the DNC was personally served under its proper name just days later. Plaintiffs' response to the Arizona Court also explained that Defendant Schultz had been served at her Washington DC office on January 30, after several attempts at different addresses. Plaintiffs' response also explained that they had not yet returned the summons for Defendant Schultz because they were awaiting the Arizona Court's conclusion regarding service via certified mail under Arizona law, as discussed in Plaintiff's response to the first show cause order. Ex.5, AZ Resp. to Or. Show Cause 2.

Both show cause orders were issued months after the DNC and Schultz had actual knowledge of the Arizona lawsuits. Both were simply routine requests for information from the Arizona Court. Both were properly responded to. Neither resulted in the Arizona Court taking any action against the Plaintiffs other than denying a default motion and requiring different methods of service. Neither order supports the TNDP Defendants' accusations that the Plaintiffs "are operating in bad faith." Doc.25 at 14.

Defense counsel's citation to the Arizona Court's orders and accusations regarding the Arizona litigation supports the conclusion that he knew that the DNC had been served weeks before those orders issued, and weeks before any motion for default was filed. Yet he chose to sign a motion filed with this Court claiming that the Plaintiffs acted in bad faith by intentionally failing to serve the DNC and its Chairman, and that the Arizona Court issued a show cause order "against Plaintiffs for this exact same conduct." Defense counsel's assertions are a lie by omission, at best.

---

[3] Plaintiffs' counsel added the DNC as soon as he became aware that the DNC may not be affiliated with the NDP USA.

Defense counsel's multiple misrepresentations to this Court not only support denial of Defendants' motion for sanctions, they are themselves sanctionable conduct.

## II.     Safe Harbor Provisions Not Followed

Even if Defendants' motion were not filed with misrepresentations to this Court, their motion must be **DENIED** because Defendants did not serve Plaintiffs with a copy of their motion for sanctions until the day said motion was filed with this Court. Defendants' counsel did serve a *notice* of their *intent* to file a Rule 11 motion, in the form of a letter. *See* Decl. Benjamin Gastel Doc.26-1 at 1 & 4-8. However, serving a letter-notice that a party intends to file a motion is not the same as *serving that motion* under the Federal Rules of Civil Procedure.

Rule 11 states in relevant part:

"The *motion* must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." (emphasis added).

The 6th Circuit has concluded, "[A]dhering to the rule's explicit language and overall structure, we hold that sanctions under Rule 11 are unavailable unless the *motion for sanctions is served* on the opposing party for the full twenty-one day 'safe harbor' period before it is filed with or presented to the court." *Ridder v. City of Springfield*, 109 F.3d 288, 297 (6th Cir. 1997) (emphasis added).

Defense counsel's letter-notice failed to cite or mention relevant authority that *was* included in his eventual motion for sanctions as filed with this Court. Defendants' motion included at least 16 citations to cases, 2 citations to Federal code, and 2 citations to Tennessee

code that were not mentioned in Defense counsel's letter-notice of intent to file. *Compare* Doc.25 *and* Doc.26-1 at 4-8.

Rule 11's plain language requires service of *the motion* 21 days prior to filing. Even if that requirement were not taken to mean what it says, it certainly requires an opportunity to be presented with the authority and arguments to be filed with the court. Defendants' letter-notice failed to do more than give notice of the general grounds upon which their intended motion would be founded. It certainly failed to fulfill Rule 11's safe harbor provision.

### III.    Defendants' Allegations are Demonstrably False

Even if Defendants' motion were not filled with misrepresentations to this Court and Defense Counsel had properly served the Plaintiffs 21 days before filing, Defendants' motion would still fail because the accusations contained within said motion are demonstrably false.

#### A.  Background: Reasonable Inquiry

Based upon his pre-litigation research, attorney Irion reasonably believed that the National Democratic Party of the USA, Inc. (NDPUSA) was a national organization that had registered to do business within the state of Tennessee, and that regardless of the true nature of the NDPUSA it was certainly capable of attempting to certify candidate Obama to the Tennessee Secretary of State.

#### i.  Communications with Secretary of State's Office

Prior to filing the instant litigation attorney Irion spoke with a staffer at the Tennessee Secretary of State's office regarding standard operating procedures for Presidential elections. Decl. Van Irion ¶2. That staffer informed attorney Irion that the National Democratic Party always sends a notice to all Secretaries of State certifying the name of the Party's candidate. *Id*.

That staffer also informed attorney Irion that without such certification from the national party organization, the Secretary of State would not place the Party's candidate's name on the Tennessee ballot. *Id.*

### ii.  Search for "Democratic" Entities

Attorney Irion then searched the Tennessee Secretary of State's records for information on any entity operating with the terms "Democratic Party" or "National Democratic Party." *Id.* at ¶3. Since all entities doing business within or with the state of Tennessee are required to register with the state, attorney Irion assumed that the National Democratic Party organization would be registered. The NDPUSA was the only entity that appeared to be a national Democratic Party organization. *Id.*

A copy of a recent search is attached showing that the NDPUSA is the only organization that comes up in a search for "National Democratic Party." Ex.6. A copy of another recent search is attached showing that "Democratic Coalition Inc." and "Democratic Party of Tennessee Inc." come up when searching for "Democratic." Ex.7. "Democratic Coalition Inc." and "Democratic Party of Tennessee Inc." both have the same control number as the NDPUSA. *Id.* Apparently they are all the same entity working under five different alternative assumed names.  Ex.8. Other entities also come up in this broader search, but all are clearly local entities.

### B.  NDPUSA's Assumed Names

Defendants' point out that the Tennessee Secretary of State's registration reflects that the NDPUSA has an assumed name of "Shelby County Republican Party Inc." Defendants go on to assert that upon seeing this "A reasonable person would have taken this to mean that the NDC USA had no relationship with the TNDP or the National Democratic Party." Doc.25 at 11.

What Defendants don't reveal to this Court is the fact that NDPUSA has *five* different names registered with the Tennessee Secretary of State: this one entity is known as "Democratic Party of Tennessee Inc.," "Democratic Coalition Inc.," "Shelby County Republican Party Inc.," "Non-Partisan Coalition for Better Government," and the "National Democratic Party of the USA Inc." Ex.8.

Defendants also fail to point out to this Court that the National Democratic Party of the USA states as its purpose: "To raise funds, Nominate and Elect Democrats in all 50 states in the United States." See Doc.26-1, Decl. Gastel, at 15.

Liberty Legal Foundation's investigators have recently confirmed that the apparent organizer of the National Democratic Party of the USA was a registered Democrat voter in 2010. Decl. Van Irion ¶17.

Attorney Irion has no idea why this organization has five names. *Id*. at ¶4. Apparently the Defendants have no idea either. Their own motion for sanctions states:

> "The NDP USA is *apparently* a mere sham organization, *possibly* organized by the Shelby County Republican Party, in order to use, without authorization and in bad faith, the name 'National Democratic Party,' *possibly* for nefarious purposes like this lawsuit." Doc.25 at 11, (emphasis added).

Seven months later the Defendants are still using the terms "apparently…possibly…possibly" to allege that the Plaintiffs should have been certain that the NDPUSA was a sham organization.

The Defendants apparently still don't know who or what the NDPUSA is, or why it was formed, or what it does. *Id*. Attorney Irion does not know either and certainly cannot be expected to have answered this question definitively before filing the instant lawsuit.[4] Even now it is

---

[4] Attorney Irion attempted to obtain a default judgment against NDPUSA for the sole purpose of eliminating the possibility that the NDPUSA is associated with the DNC or is an agent of the

unclear who formed the NDPUSA or why it was formed or what other entities it may be associated with. Attorney Irion's assumption that NDPUSA is affiliated with the national level of the Democratic Party is far more reasonable than the Defendants' assumption that the same entity "apparently…possibly…possibly" may be a "nefarious" trick by the Republicans.

Contrary to Defendants' assertion, there still is no evidence that would lead a reasonable attorney to the certain conclusion "that the 'National Democratic Party of the USA, Inc.' is not affiliated with the DNC or the Democratic Party in any way." Doc.28 at 8. The Defendants still have produced no evidence to support such a conclusion. The only information revealed seven months after the filing of this lawsuit is that the NDPUSA has five names and that one of these names does not seem to fit with the others, and that the stated purpose of the NDPUSA is to "raise funds, Nominate and Elect Democrats in all 50 states in the United States." This proves nothing other than the fact that the Defendants are willing to deceive this Court by implying that the NDPUSA has only two names. It certainly does not conclusively prove that the NDPUSA is not affiliated with the DNC or Democratic Party in any way.

Based on the information available about the NDPUSA it would be just as reasonable to assume that the Defendants set up the NDPUSA as a trap for unwary attorneys attempting to sue the national level of the Democratic Party. The accusations against attorney Irion are as unreasonable and unsupported as an accusation that the instant motion for sanctions is the result of a scheme by the Defendants to accuse unwary attorneys of colluding with a sham organization which the Defendants set up themselves.

---

DNC. Decl. Irion at ¶6. If there is no such association between these organizations, a default judgment would have done nothing to curtail the activities of the DNC. If there is an association between these organizations, the DNC would have been forced to defend the NDPUSA. The motion for default was intended to be a quick and simple method to set aside this issue. *Id.*

Attorney Irion makes no such wild accusations because attorney Irion has no direct evidence to support such accusations. Of course the Defendants have no evidence to support their accusations either, because their accusations are completely false.

## C. Defendants' Accusation That Attorney Irion Attempted to Keep the Instant Lawsuit a Secret from the DNC is Provably False

One of Defendants' accusations is that attorney Irion somehow knew that the National Democratic Party of the USA, Incorporated (NDPUSA) is a sham organization, and that attorney Irion decided to take advantage of this information by naming NDPUSA in order to get a default judgment against NDPUSA. Doc.25 at 13-14. Defendants' motion asserts that attorney Irion intentionally delayed service of the summons and complaint upon Defendants DNC and its current chairman, Defendant Schultz, in order to allow attorney Irion to file an unopposed motion for default judgment against NDPUSA, before the DNC or Schultz knew about the instant lawsuit. *Id.*

The facts at hand prove this to be false.

### i. Timing of Service Attempts Disprove Defendants' Accusation

On December 6th attorney Irion attempted personal service upon Defendant NDPUSA by personally delivering a copy of the summons and complaint to the office of the Arizona Democratic Party in Phoenix. [5] Decl. Irion at ¶7; Decl. Dummett at ¶2. This attempt proves that attorney Irion was not trying to keep the instant lawsuit a secret from Defendants DNC or Schultz. The documents personally delivered to the staff at the Phoenix Democratic Party office included a summons and complaint, naming the National Democratic Party of the USA, Inc. as

---

[5] The fact that attorney Irion attempted personal service upon the Phoenix office of the Democratic Party also proves that attorney Irion believed at that time that the NDPUSA was a national organization with offices in every state.

the first named defendant. *Id*. The manager of that office spoke about the summons and complaint with attorney Irion, Plaintiff Dummett, and Plaintiff Dummett's campaign manager. *Id*. This attempt at personal service was video-taped and posted on YouTube Dec 14, 2011. *Id*.; *See* YouTube video at http://www.youtube.com/watch?v=m3uChtcVcUA (last visited May 22, 2012) (showing the Democratic Party staffer acknowledging the location and attorney Irion stating that the lawsuit is against the "National Democratic Party," and showing the office manager making an obscene gesture at the camera).

If Defendants' accusations were true, that attorney Irion wanted to keep the instant lawsuit a secret from the DNC, attorney Irion would not have personally delivered a copy of the summons and complaint to an office of the Democratic Party days after filing.

Additionally, more than a month before attorney Irion filed a motion for default judgment against NDPUSA he sent via certified mail a copy of the summons and first and second complaints, to the DNC at its Washington DC office.[6] Decl. Irion at ¶9. Those documents were received by the DNC before December 22, 2011. *Id.*; *See also* Ex.1. If Defendants' accusations were true, that attorney Irion wanted to keep the instant lawsuit a secret from the DNC, attorney Irion would not have sent a copy of the summons and complaint ***to the DNC*** more than a month before he filed a motion for default judgment.

Also, when Attorney Irion filed a motion for default judgment against NDPUSA he mailed ***a copy of that motion*** and all three complaints to the current chairman of the DNC, Defendant Schultz, at her Congressional office in Washington DC. Decl. Irion at ¶10.  Those documents were received by Defendant Schultz on January 30. *Id.*; Ex.2.

---

[6] The fact that attorney Irion sent copies of the Complaints and summons against the NDPUSA to the DNC's Washington DC offices also proves that attorney Irion believed at that time that the NDPUSA was the entity that coordinates the Democratic Party's national organization.

Again, if the Defendants' accusations were true attorney Irion would not have sent a copy of the motion for default judgment to the current chairman of the DNC, Defendant Schultz, immediately after that motion was filed.

### ii. Press Release and Media Coverage Negate Defendants' Allegation

In October, immediately after filing the first complaint, attorney Irion sent a press release to all of his media contacts, including several staffers at Fox News and a staff writer for World Net Daily (WND). Decl. Irion at ¶11; Ex.9-10. Mr. Irion has appeared on Fox News' Greta Van Sustren Show and Freedom Watch with Andrew Napolitano. Decl. Irion at ¶11; *see also* http://libertylegalfoundation.org/. Therefore attorney Irion expected that Fox News would cover the instant lawsuit.

The World Net Daily writer, Bob Unruh, regularly writes about Liberty Legal Foundation's (LLF) efforts and has written several times about LLF's eligibility lawsuits. Decl. Irion at ¶12. WND is read by millions of Americans. Note that the e-mail sent to Mr. Unruh by attorney Irion had a copy of the complaint naming NDPUSA as the first named defendant attached to it. Ex.9. Mr. Unruh habitually includes copies of such documents as part of his articles for WND. Decl. Irion at ¶12. Attorney Irion included the document because he was aware of Mr. Unruh's practice. *Id*. The subsequent article was published online on November 8, 2011 at http://www.wnd.com/2011/11/360813/. Ex. 11.

Had attorney Irion been attempting to keep the instant lawsuit a secret from the DNC, as the Defendants assert, he would not have sent out press releases to national media outlets that have regularly covered his activities in the past.

The evening before attorney Irion personally served the complaint at the Arizona Democratic Party's office in Phoenix he appeared at a Tea Party meeting with Sheriff Joe Arpaio

to discuss the lawsuit. Decl. Irion at ¶8; Decl. Dummett at ¶3. Details were discussed with members of the media at the meeting. Decl. Irion at ¶8. Coverage of this event can be found at http://www.examiner.com/article/liberty-legal-foundation-serves-dnc-with-obama-eligibility-complaint. *See* Ex. 12. This article also confirms that attorney Irion believed at that time that the NDPUSA was the national organizing entity for the Democratic Party and that it had offices in every state: "Van Irion and Dummett served the DNC at its office in Phoenix on Tuesday." *Id*. (describing attorney Irion's statements to the Tea Party group).

Had attorney Irion been attempting to keep the instant lawsuit a secret from the DNC, as the Defendants assert, he would not have announced the lawsuit to the media and dozens of members of the public in early December.

Immediately upon filing the first complaint Liberty Legal Foundation posted the complaint on its web site and sent an e-mail message to its over 30,000 members with a link to the complaint. Decl. Irion at ¶13; *see also* http://libertylegalfoundation.org/wp-content/uploads/2011/10/CCA-AZ-1st-Amd.-Compl.-filed.pdf.   Attorney Irion is aware of the fact that at least one current White House staffer has signed up on Liberty Legal Foundation's e-mail mailing list in order to monitor LLF's activities. Decl. Irion at ¶14.

Again, if attorney Irion had been attempting to keep the instant lawsuit a secret from the DNC, as the Defendants assert, he would not have posted his activities on LLF's web site and sent out regular e-mails to over 30,000 Americans, including at least one White House staffer.

The Defendants assertion that attorney Irion attempted to keep the instant lawsuit secret from the DNC is absurd.

**D. Attorney Irion's Multiple Attempts to Serve NDPUSA All Failed, Proving That He Has No Inside Information About or Affiliation with NDPUSA**

Defendants' theory, that attorney Irion knew NDPUSA was a sham organization, requires an assumption that attorney Irion had some contact with or knowledge of the organizers of NDPUSA. However, anyone with such knowledge would also know how to successfully serve the organization. Yet attorney Irion's attempts to serve NDPUSA at its Tennessee office were all returned as undeliverable.[7] Decl. Irion at ¶15; Ex.13-16.

If attorney Irion had been in collusion with the NDPUSA, or any of its organizers, or if attorney Irion had any inside knowledge regarding the NDPUSA, then he would have known how to serve the summons and complaint on the alleged sham organization.

The fact that attorney Irion was unable to successfully serve the NDPUSA, despite multiple attempts, conclusively proves that he had no inside information about the NDPUSA.

**E. Defendants' Allegations Regarding Venue are Completely Unsupported, Contrary to Common Sense, and are False**

Defendants accuse Plaintiffs of naming the NDPUSA for the purpose of establishing venue in Shelby County. Doc.25 at 11-15. They cite the demonstrably false factual assertions that are debunked supra, as their proof of this accusation.

In addition to the lack of factual support for Defendants' accusation, the Plaintiffs have already established that they would not have needed to name the NDPUSA to establish venue in Shelby County. For all the reasons discussed in Plaintiffs' opposition to Defendants' motion for change of venue, venue is proper in Shelby County even if the NDPUSA was not a party to the

---

[7] In December attorney Irion sent copies of the summons and complaint against NDPUSA to the office of the DNC in Washington DC. That delivery was successful, but service was not successful because, unknown to attorney Irion at the time, NDPUSA and the DNC were apparently not the same entity.

instant litigation. *See* Doc.21. With this in mind, the Defendants' completely unsupported accusation is absurd.

Also, the Defendants do not even offer a suggestion as to why the Plaintiffs would want to establish venue in Shelby County. Liberty Legal Foundation and attorney Irion have offices in Knoxville and Monroe County Tennessee, more than 400 miles from Shelby County. Attorney Irion has never practiced nor had any other contact with any Court or Court's personal in Shelby County prior to the instant lawsuit. Neither Liberty Legal Foundation nor attorney Irion have ever practiced before any court in Nashville, including the Middle District of Tennessee, with the exception of one Bankruptcy case that ended favorably for attorney Irion's clients two years ago. The Plaintiffs did not perform any research regarding the political leanings, or any other characteristics of any judge in middle or western Tennessee prior to filing the instant suit.

In short, the Plaintiffs had, and have, no motive to establish venue in Shelby County, nor do they have any motive to avoid Davidson County.[8] The Plaintiffs filed suit in Shelby County for the simple reason that the NDPUSA identified Memphis as the location of its Tennessee office and its agent for service of process.[9]

### F.  Defense Counsel Was Aware That His Accusations Were False

This timeline of these events is clear in the record and Defense counsel is well aware of these facts, yet he insisted upon accusing attorney Irion of "operating in bad faith." Doc.25 at 14.

---

[8] This should not be taken as agreement by the Plaintiffs to a change of venue at this time. Now that this case has been established in the Western District there is no reason to move it. Any such change of venue would almost certainly cause unnecessary delays in litigation.

[9] Defendants note that T.C.A. §48-101-502 exempts political parties from that chapter's registration requirements. However, this exemption does not prohibit such registration. Nor does it make a search of these registrations unreasonable. Nor does it make naming an apparent political party that has, in fact registered unreasonable.

The evidence leaves no possibility that Defendants' accusations against attorney Irion are true. Their motion for sanctions on these grounds must be **DENIED**.

## IV.   Non-Frivolous Claim

### A.  The Instant Case is Distinguishable on the Standing Issue Alone

Defendants' motion willfully ignores the critical difference between the instant lawsuit and every other lawsuit challenging Obama's constitutional qualifications to hold the office of President. Specifically, the instant case involves a Plaintiff that is a candidate against Mr. Obama in the upcoming general Presidential election. Despite Defendants' deceptive statements in a recent filing, candidate-standing is well established. "This notion of 'competitive standing' has been recognized by several circuits." *Drake v. Obama*, 664 F.3d 774, 782-3 (9th Cir. 2011); *citing Hollander v. McCain*, 566 F.Supp.2d 63, 68 (D.N.H. 2008); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586-87 & n.4 (5th Cir.2006); *and Schulz v. Williams*, 44 F.3d 48, 53 (2nd Cir. 1994).

The "mountain of case law" referred to in Defendants' motion and cited in their Exhibit A were *all* dismissed for lack of standing. With the exception of *Drake v. Obama*, which was dismissed on mootness grounds because President Obama had already taken office, none of the cases cited by the Defendants involved a competitive candidate as plaintiff. This difference distinguishes the instant case from all similar cases to date.[10,11]

---

[10] Defendants' motion states at least twice that the attorney in *Kerchner v. Obama* was sanctioned by the 3rd Circuit for bringing frivolous claims challenging Obama's qualifications. *See* Doc.25 at 10, citing 612 F.3d 204 (3rd Cir. 2011). This is incorrect. The 3rd Circuit issued an order to show cause, but upon receiving the attorney's response to that order, the Court did not issue sanctions.

[11] Defendants cite a state court case from Indiana, *Arkeny v. Governor*, as reaching the substantive Article II issue presented in the instant case. 916 N.E.2d 678 (Ind. Ct. App. 2009). However, as with the "mountain of case law" cited by the Defendants, the plaintiff in *Arkeny* was

## B.  Preemption and Freedom to Associate Issues Already Addressed

To the degree that Defendants' motion for sanctions alludes to preemption and freedom to associate arguments, the Plaintiffs have already addressed those issues in their opposition to Defendants' motions to dismiss. The Plaintiffs incorporate by reference, here, their previous responses to said arguments.

## C.  The Minor Court's Definition of Natural Born Citizen is Binding Precedent

A simple reading of *Minor v. Happersett* makes it is clear that the Court defined "natural born citizen," as it appears in article II of the Constitution, *as part of its holding*. 88 U.S. 162, 167-8 (1875). The *Minor* Court's definition of "natural-born citizen" is binding precedent and has not been abrogated by the dicta from *Wong Kim Ark* (WKA) or any other subsequent Supreme Court precedent. Language to the contrary from subsequent Supreme Court opinions is purest dicta. Any rulings from other courts are simply incorrect. Unless and until the U.S. Supreme Court revisits this issue, the *Minor* Court's definition is binding.

### i.  The Minor Court's Definition of NBC was Part of its Holding and is, Therefore, Binding Precedent

In order to reach its holding, the *Minor* Court first had to establish that Mrs. Minor was a citizen. It explicitly did so by determining that she was a natural born citizen: "For the purposes of this case it is not necessary to solve these doubts. It is sufficient for everything we have now to consider that all children born of citizen parents within the jurisdiction are themselves citizens." *Id*. at 167. The definition the Court is using here is the Court's own definition of

---

not a competitive candidate, as in the instant case. The *Arkeny* Court explicitly held that the plaintiff in that case lacked standing. The *Arkeny* Court then went on to address the Article II issue. However, by the Courts' own admission, it lacked jurisdiction to reach the substantive issue. Therefore any case that cites *Arkeny* as precedent is not only citing dicta, it is citing a Court that proven that it was willing to reach an issue that it explicitly held it had no authority to reach.

natural-born citizen from earlier in the same paragraph. Because both of Mrs. Minor's parents were U.S. citizens at the time she was born, and she was born in the U.S., she was a natural born citizen. Because *all* natural born citizens are also within the broader category "citizen," Mrs. Minor was a citizen. This is why the Court did not need to resolve doubts about the outer limits of the term citizen. Mrs. Minor was a citizen because she was clearly within the narrower category of natural-born citizen.

The *Minor* Court's decision to establish that Mrs. Minor was a citizen because she was a natural born citizen followed the well-established doctrine of judicial restraint. Judicial restraint required the *Minor* Court to avoid interpreting the citizenship clause of the 14th Amendment if the circumstances presented in the case at hand did not require the Court to construe the 14th amendment's citizenship clause in order to reach its holding. The facts presented did not require such an interpretation, so the Court did not reach the 14th amendment's citizenship clause. But this restraint did require the Court to conclude that Mrs. Minor was a citizen via its definition of natural-born citizen and its conclusion that *all* natural-born citizens are within the broader category of "citizens." This is why the *Minor* court made the statement "For the purposes of this case it is not necessary to solve these doubts. It is sufficient for everything we have now to consider that all children born of citizen parents within the jurisdiction are themselves citizens." *Id*. at 168. **In other words, the *Minor* Court's definition of "natural born citizen" was pivotal to reaching its holding.**

The Court then discussed several other types of citizenship as general examples of its conclusion that women could be citizens. However, it then returned to the specific case of Mrs. Minor, concluding: "The fourteenth amendment did not affect the citizenship of women any more than it did of men. In this particular, therefore, the rights of Mrs. Minor do not depend upon

the amendment. She has always been a citizen from her birth, and entitled to all the privileges and immunities of citizenship." *Id*. at 170.

Because the *Minor* Court's definition of "natural born citizen" was pivotal to reaching its holding, the Court's definition is part of its holding and is, therefore, also precedent. *See Black's Law Dictionary* 737 (Bryan A. Garner ed., 7th ed., West 1999) ("holding, n. 1. A court's determination of a matter pivotal to its decision"); (*see also Id*. at 1195 defining "precedent" and *quoting* James Parker Hall, *American Law and Procedure* xlviii (1952); *see also Black's Law Dictionary* at 465, distinguishing "dictum gratis": "A court's discussion of points or questions not raised by the record or its suggestion of rules not applicable in the case at bar.").

### ii. Dicta from *Wong Kim Ark* Cannot Alter Precedent from *Minor*

The *Minor* Court did not leave open the question of the definition of natural-born citizen as that term is used in Article II. It did, however, leave open the scope of the term citizen as that term is used in the 14th Amendment. This is the question that the WKA Court addressed. *United States v. Wong Kim Ark*, 169 U.S. 649, 653 & 705 (1898). The WKA Court's holding is clearly identified by that Court as its holding. Its holding is very fact specific and limited to determining the scope of the term citizen under the 14th Amendment. WKA involved a person born in the U.S. to parents that were *both* non-citizens. The facts of WKA simply did not provide that Court an opportunity or reason to re-visit Article II's natural-born citizen. Dicta cannot abrogate precedent. See *Black's Law Dictionary* 465 (Bryan A. Garner e., 7th ed., West 1999)(*defining* Dictum Gratis). Therefore, WKA cannot abrogate the definition of Article II natural-born citizen from *Minor*.

A contrary reading of *Minor* and WKA also violates doctrines of constitutional construction established in *Marbury v. Madison* and judicial restraint, as well as language from

the *Minor* Court establishing that the 14th Amendment did not create any new privileges and immunities. *See* 5 U.S. 137, 174 (1805); *Minor*, 88 U.S. at 171. Interpreting the 14th Amendment in a way that allows a person with two foreign parents to qualify for the office of President would clearly have created a new privilege. The *Minor* Court explicitly stated that the 14th Amendment created no new constitutional privileges. *Minor*, 88 U.S. at 171. The *Minor* Court had to reach this issue because it was determining Mrs. Minor's privileges under the 14th Amendment. However, Mr. Ark was not attempting to run for President, nor did the WKA Court's decision require it to re-visit the definition of Article II natural born citizen for any other reason. Therefore, any statement from the WKA Court that could possibly be interpreted to alter Article II, is purest dicta.

This reading of *Minor* and WKA respect the foundational principals of constitutional construction and legal interpretation. This reading of *Minor* and WKA leave these two Supreme Court opinions in harmony because these cases were answering different questions regarding different aspects of the Constitution.

### V.    Conclusion

Far from being frivolous, the Plaintiffs claims should prevail. The instant case brings a legitimate question of law with plaintiffs that have standing on a significant Constitutional issue. It is therefore not a frivolous claim. Defendants' motion contains proven misrepresentations to this Court and their factual accusations against the Plaintiffs have been proven to be false.  For all these reasons the Defendants' motion for sanctions must be **DENIED**.

Further, Pursuant to Federal Rule of Civil Procedure 11(c)(2) Plaintiffs request that this Court order that the Defendants pay Plaintiffs' reasonable attorney's fees and costs incurred in responding to Defendants unfounded motion.

Respectfully submitted on the 18th Day of Sivan, in the year of our Lord 2012 (a.k.a. June 8, 2012).

     s/Van R. Irion               
Van R. Irion (TNBPR#024519)
Liberty Legal Foundation
9040 Executive Park Drive, Ste. 200
Attorney for Plaintiffs
(423) 208-9953

## CERTIFICATE OF SERVICE

It is hereby certified that on 18th Day of Sivan, Year of our Lord 2012 (a.k.a. June 8, 2012), a copy of "Plaintiffs' Response in Opposition to Defendants' Motions for Sanctions" was filed electronically. Parties may access this filing through the Court's electronic filing system. A copy of this motion will also be served upon the Defendants via mail.

     s/Van R. Irion               
Van R. Irion
Liberty Legal Foundation
9040 Executive Park Drive, Ste. 200
Attorney for Plaintiffs
(423) 208-9953